## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **KEITH A. CELSKY, JR.,** | : | **CIVIL ACTION NO. 1:18-CV-2416** |
| | : | |
| **Plaintiff** | : | **(Judge Conner)** |
| | : | |
| **v.** | : | |
| | : | |
| **PENNSYLVANIA HIGHER** | : | |
| **EDUCATION ASSISTANCE** | : | |
| **AGENCY,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Plaintiff Keith A. Celsky, Jr., filed this civil rights lawsuit against defendant Pennsylvania Higher Education Assistance Agency ("PHEAA").  Celsky alleges discrimination under the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*  PHEAA moves for summary judgment.

## I.   Factual Background and Procedural History[1]

PHEAA is a state agency focused on student financial aid services, primarily providing loan servicing, financial-aid processing, and other aid programs to

---

[1] Local Rule 56.1 requires that a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56 be supported "by a separate, short, and concise statement of the material facts, in numbered paragraphs, as to which the moving party contends there is no genuine issue to be tried."  LOCAL RULE OF COURT 56.1. A party opposing a motion for summary judgment must file a separate statement of material facts, responding to the numbered paragraphs set forth in the moving party's statement and identifying genuine issues to be tried.  Id.  Unless otherwise noted, the factual background herein derives from the parties' Rule 56.1 statements of material facts.  (See Docs. 17, 20).  To the extent the parties' statements are undisputed or supported by uncontroverted record evidence, the court cites directly to the Rule 56.1 statements.

millions of students in the Commonwealth.[2]  It is undisputed that PHEAA is an "employer" within the meaning of the ADA.  (Doc. 17 ¶ 1; Doc. 20 ¶ 1).

Celsky began working for PHEAA in December 2013 as a Customer Service Representative in PHEAA's call center.  (Doc. 17 ¶¶ 2, 5).  In that position, Celsky answered "regular split" or "technical split" phone calls, which were basic incoming calls seeking customer service assistance.  (Id. ¶ 6).  Less than a year later, Celsky was promoted to Customer Service Representative 1, incorporating the duties of his prior position with the addition of processing paperwork.  (Id. ¶¶ 7-8; Doc. 15-4 at 139-230, Celsky Dep. 9:12-10:2, 14:24-15:2 [hereinafter "Celsky Dep."]). In September 2015, PHEAA promoted Celsky to Customer Service Lead (or "Lead"), another position within PHEAA's call center.  (Doc. 17 ¶¶ 9-10).

Much of the controversy in this case concerns the job duties of a Customer Service Lead.  PHEAA's official job description provides that, among other responsibilities, a Lead will "[p]erform[] lead duties within a work group," "provide direct guidance and assistance to Customer Service Representatives 1 and 2," "[f]ield customer calls as necessary and act as a resource for the most complex customer calls," "[m]onitor calls," "[p]rovide training and mentoring," "[i]dentify broader training needs for individuals and the team," "[a]ct as a liaison for routine requests," and "[a]ssist [the] supervisor in quality assurance review." (Doc. 15-4 at 19).

---

[2] *About PHEAA*, PHEAA, http://www.pheaa.org/about/ (last visited September 1, 2020).

Celsky testified that, when he first began working as a Lead, his responsibilities primarily consisted of helping other representatives find answers to questions while they were on the phone, processing extensive paperwork, and mentoring other team members. (Celsky Dep. 15:17-16:1). He estimated that he took one or two calls a week, "if that," constituting "maybe five percent" of his work duties. (Id. at 15:21-22, 16:2-24). Those calls were usually "escalated," where customers were looking to speak with a supervisor or "work their way up the chain of command on the phone." (Id. at 16:2-10). Over time this breakdown shifted, to the point where Celsky was taking mostly regular and technical split calls all day Monday and Tuesday and for several hours a day on Wednesday through Friday, resulting in "well over 50 to 60, maybe 75 percent" of his time being spent taking general incoming calls. (Id. at 17:1-18:4, 21:20-23, 35:7-14). Celsky understood this increase to be the result of "high call volume." (Id. at 35:15-18)

In May 2016, Celsky received his first notice in a series of disciplinary actions regarding his work performance. (See generally Doc. 17 ¶¶ 14-17, 19-20, 22-23, 27-28, 36, 40, 50, 52, 54, 72). Over the following 21 months leading up to his termination, Celsky received numerous "coachings," warnings, reprimands, and escalating discipline due to his refusal to take phone calls and his unauthorized absences on days when he was expected to field calls. (See id.) Celsky does not deny receiving the various reprimands and discipline, nor does he challenge PHEAA's stated reasons for them. (See Doc. 20 ¶¶ 14-17, 19-20, 22-23, 27-28, 36, 40, 50, 52, 54, 72). Rather, Celsky maintains that his refusal to field calls and his attendance issues were the result of certain medical conditions—including severe

anxiety and panic attacks—which were particularly acute when having to interact with customers on the phone. (See Doc. 17 ¶¶ 21, 41, 58; Doc. 20 ¶¶ 49, 79).

Approximately one year into development of his medical issues, Celsky opted to take medical leave under the Family and Medical Leave Act ("FMLA"). (Doc. 17 ¶¶ 30-31). He exhausted that leave during several periods from June to September 2017. (Id. ¶ 31). Upon returning to work, Celsky again began to incur coachings and reprimands for failing to take calls and for unauthorized absences on call-heavy Mondays and Tuesdays. (Id. ¶¶ 36, 39-40).

In October 2017, Celsky formally requested a disability accommodation from PHEAA. (Id. ¶ 38). Specifically, Celsky sought to be excused from "using the phone to communicate" per the recommendation of his treating physician. (Doc. 15-4 at 281; Doc. 17 ¶ 41). PHEAA denied this request on November 29, 2017, informing Celsky that "taking phone calls is an essential function of" his job responsibilities. (Doc. 15-4 at 277). PHEAA explained that it was "willing to discuss and consider any other suggested reasonable accommodations" Celsky may have "which will enable [him] to perform the essential functions of [his] position." (Id.) Celsky was not disciplined for his absences during the time his accommodation request was pending. (Doc. 17 ¶¶ 42-43).

Celsky's pattern of avoiding or refusing phone calls and taking unexcused absences (as well as receiving progressive discipline for such conduct) continued throughout late 2017 and into early 2018. (Id. ¶¶ 47-56). Upon PHEAA's request, Celsky provided an updated medical status in late January 2018 from his treating psychotherapist. (Id. ¶¶ 57-58). The paperwork indicated that Celsky suffered from

"generalized anxiety disorder" and "specific phobia" related to phone usage.  (Doc.
15-4 at 287-88).  According to Celsky's psychotherapist, "phone work triggers severe
physical anxiety symptoms," and the duration of this impairment was "[u]nknown"
and could be accommodated by "[l]imited phone work" at that time.  (Id. at 288,
290).  Celsky's psychotherapist later clarified this last statement by explaining that
"it would be in [Celsky's] best interest to not be required to do phone work of any
kind" that exceeded Celsky's "comfort level."  (Id. at 295).  Notably, Celsky admits
that he was simply unable to take any phone calls at that time.  (Doc. 17 ¶ 68; Doc.
20 ¶ 68).  PHEAA again denied this "no-phone-call" accommodation request
because taking phone calls was an essential function of Celsky's job.  (Doc. 17 ¶¶ 61-
62, 69).

        At approximately the same time, Celsky and his superiors began to discuss
transfer to a different position within the agency.  (See id. ¶ 73).  The parties
disagree on specifics, but it is undisputed that, around November 2017, Celsky
suggested transfer to two part-time paperwork processing positions to replace his
full-time Lead job.  (Id. ¶ 80).  According to Celsky, this request was denied.  (Celsky
Dep. 42:16-43:19).  PHEAA asserts that no part-time processing positions existed at
the time and that it directed Celsky to its "Pathways" intranet site, which contained
"all existing, vacant positions within PHEAA."  (Doc. 17 ¶¶ 82, 84).  Celsky explicitly
disputes the representation that no such positions were available, (Doc. 20 ¶ 82), but
he acknowledges that he was directed to, and that he used, the Pathways site to
search for job openings, (id. ¶¶ 84, 86).

PHEAA terminated Celsky on February 16, 2018, for "unsatisfactory attendance." (Doc. 17 ¶ 72). This termination followed several more incidents where Celsky refused to take calls, left work early to avoid them, or failed to come to work at all. (See id. ¶¶ 70-72). Celsky filed a charge of employment discrimination with the Equal Employment Opportunity Commission ("EEOC"), and the EEOC issued a right-to-sue letter on October 3, 2018. (Doc. 1 ¶¶ 7-8). In December 2018, Celsky filed the instant lawsuit asserting a single count of discrimination—alleging failure to accommodate—under the ADA. (Id. ¶¶ 24-32).[3] PHEAA moves for summary judgment on this claim, and the motion is fully briefed and ripe for disposition.

## II.   <u>Legal Standard</u>

Through summary adjudication, the court may dispose of those claims that do not present a "genuine dispute as to any material fact" and for which a jury trial would be an empty and unnecessary formality. FED. R. CIV. P. 56(a). The burden of proof tasks the non-moving party to come forward with "affirmative evidence, beyond the allegations of the pleadings," in support of its right to relief. <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315 (M.D. Pa. 2004); <u>see also</u> <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23 (1986). The court is to view the evidence "in the light most favorable to the non-moving party and draw all reasonable inferences

---

[3] Celsky alleges that he cross-filed with the Pennsylvania Human Relations Commission. (<u>See</u> Doc. 1 ¶ 7). Because his complaint does not assert a claim under the Pennsylvania Human Relations Act, we confine our discussion to Celsky's ADA claim.

in that party's favor." <u>Thomas v. Cumberland County</u>, 749 F.3d 217, 222 (3d Cir. 2014).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 250-57 (1986); <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587-89 (1986).  Only if this threshold is met may the cause of action proceed. <u>See</u> <u>Pappas</u>, 331 F. Supp. 2d at 315.

## III.    **<u>Discussion</u>**

The ADA mandates that an employer may not "discriminate against a qualified individual on the basis of disability in regard to . . . hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. § 12112(a).  To make out a *prima facie* case of discrimination under the ADA, a plaintiff must establish: (1) he has a disability; (2) he is a "qualified individual"; and (3) the defendant discriminated against him because of his disability. <u>See</u> <u>Furgess v. Pa. Dep't of Corr.</u>, 933 F.3d 285, 288-89 (3d Cir. 2019) (citing <u>Chambers *ex rel.* Chambers v. Sch. Dist. of Phila. Bd. of Educ.</u>, 587 F.3d 176, 189 n.19 (3d Cir. 2009)).  In the employment context, the third prong requires showing an "adverse employment action" taken by the employer because of the plaintiff's disability. <u>See</u> <u>Buskirk v. Apollo Metals</u>, 307 F.3d 160, 166 (3d Cir. 2002).  The burden of establishing a *prima facie* case "is not onerous," <u>Doe v. C.A.R.S. Prot. Plus, Inc.</u>, 527 F.3d 358, 365 (3d Cir. 2008) (quoting <u>Tex. Dep't of Cmty. Affairs v. Burdine</u>, 450 U.S. 248, 253 (1981)), and presents a "low bar" for employment-discrimination plaintiffs, <u>Scheidemantle</u>

v. Slippery Rock Univ. State Sys. of Higher Educ., 470 F.3d 535, 539 (3d Cir. 2006)

(citation omitted).

PHEAA's motion for summary judgment challenges Celsky's *prima facie* case
of disability discrimination on two grounds.  PHEAA contends that (1) Celsky is not
a "qualified individual" within the meaning of the ADA, and (2) Celsky cannot show
an adverse action taken by PHEAA because of Celsky's disability.  We address each
contention in turn.

### A.    Qualified Individual

The ADA defines "qualified individual" as "an individual who, with or
without reasonable accommodation, can perform the essential functions of the
employment position that such individual holds or desires."  42 U.S.C. § 12111(8).
The relevant regulations divide the "qualified individual" analysis into two prongs:
*first*, "the individual satisfies the requisite skill, experience, education and other
job-related requirements of the employment position such individual holds or
desires," and *second*, "with or without reasonable accommodation, [the individual]
can perform the essential functions of such position."  29 C.F.R. § 1630.2(m).

The gravamen of PHEAA's first argument is that taking customer calls is an
essential function of the Lead position and, therefore, Celsky was not a qualified
individual because he could not perform this function with or without reasonable
accommodation.[4]  PHEAA posits that the official written job description, work

---

[4] PHEAA does not contend that Celsky did not satisfy "the requisite skill,
experience, education and other job-related requirements" of the position.  (See
Doc. 16 at 16 n.4).

experience of Celsky and other Leads, and reasons underlying Celsky's promotion to the position unequivocally establish that fielding calls is an essential function of the job. Celsky counters primarily by citing to his own experience when he first took the Lead position, when taking calls consumed only a small percentage of his time.

Whether a particular duty is an essential function of the employment position is a fact-intensive inquiry. Conneen v. MBNA Am. Bank, N.A., 334 F.3d 318, 326 (3d Cir. 2003). Such a determination must be made on a case-by-case basis considering all relevant evidence. Id. (quoting Deane v. Pocono Med. Ctr., 142 F.3d 138, 148 (3d Cir. 1998) (en banc)). Whether a function is "essential" is usually a question of fact for the jury, see Turner v. Hershey Chocolate U.S., 440 F.3d 604, 613 (3d Cir. 2006), with no single evidentiary factor being dispositive, see id. at 613 n.6; Skerski v. Time Warner Cable Co., 257 F.3d 273, 279 (3d Cir. 2001) (citation omitted); Deane, 142 F.3d at 148. However, when the essential requirements of a particular job are not genuinely disputed, summary judgment may be appropriate. See, e.g., Kieffer v. CPR Restoration & Cleaning Servs., LLC, 733 F. App'x 632, 636-37 (3d Cir. 2018) (nonprecedential); Miller v. Univ. of Pittsburgh Med. Ctr., 350 F. App'x 727, 729 (3d Cir. 2009) (nonprecedential).

ADA regulations define "essential functions" as "the fundamental job duties of the employment position the individual with a disability holds or desires," expressly excluding "marginal functions" of the job. 29 C.F.R. § 1630.2(n)(1). The attendant regulations provide helpful guidance in determining whether a function

is "essential."  Initially, Section 1630.2(n)(2) provides three nonexhaustive reasons

why a job function may be essential:

- the reason the position exists is to perform that
function;

- the limited number of employees available among
whom the performance of that job function can be
distributed; and/or

- [t]he function may be highly specialized so that the
incumbent in the position is hired for his or her
expertise or ability to perform the particular function.

Id. § 1630.2(n)(2)(I)-(III).  Subsection (n)(3) then provides seven nonexhaustive

examples of probative evidence to consider when making an "essential functions"

assessment.  That evidence includes

(i) [t]he employer's judgment as to which functions are
essential; (ii) [w]ritten job descriptions prepared before
advertising or interviewing applicants for the job;
(iii) [t]he amount of time spent on the job performing the
function; (iv) [t]he consequences of not requiring the
incumbent to perform the function; (v) [t]he terms of a
collective bargaining agreement; (vi) [t]he work
experience of past incumbents in the job; and[] (vii) [t]he
current work experience of incumbents in similar jobs.

Id. § 1630.2(n)(3)(i)-(vii).

PHEAA satisfies two of the three reasons provided in subsection (n)(2).

Although the bulk of Celsky's call responsibilities involved fielding general

customer service calls, he was also required to take escalated calls, for which there

were a limited number of Leads available.[5]  See id. § 1630.2(n)(2)(II).  The record

likewise establishes that one of PHEAA's primary reasons for promoting Celsky to

the Lead position was his prior experience with, and willingness to handle,

problematic customer service calls.  (Doc. 15-4 at 253); 29 C.F.R. § 1630.2(n)(2)(III).

Under subsection (n)(3), PHEAA adduces four of the seven types of evidence

outlined.  Obviously, in PHEAA's judgment, taking calls is an essential function of

the Lead position.  (See Doc. 17 ¶¶ 45, 61, 62); 29 C.F.R. § 1630.2(n)(3)(i).  The written

job description states that Leads will "[f]ield customer calls as necessary" and

"[s]upport direct operations of the work team (such as customer calls . . . ) as

necessary."  (Doc. 15-4 at 19); see 29 C.F.R. § 1630.2(n)(3)(ii).  And Celsky admits

that, during the relevant period in his tenure as a Lead, he was spending "well over

50 to 60, maybe 75 percent" of his time taking calls and other Leads were doing the

same.  (Celsky Dep. 17:1-18:4, 21:20-23, 35:11-22); see 29 C.F.R. § 1630.2(n)(3)(iii),

(vii).

Celsky does not dispute any of the evidence adduced by PHEAA.  Instead, he

asks us to consider how the Lead role, and particularly the amount of time spent on

the phone, changed over time.  (Doc. 19 at 7-8).  This argument fails to create a

dispute of fact as to whether taking calls is an essential function of the job.  By

Celsky's own account, he was required to take calls throughout his tenure as a

---

[5] We recognize that PHEAA offered, as an accommodation, to temporarily relieve Celsky of the responsibility of taking escalated calls so long as he continued to take his share of general calls.  (See Doc. 17 ¶ 77).  However, this accommodation was not permanent, as PHEAA expected Celsky to resume escalated calls at some point in the near future.  (See id.)

Lead.  He admits that he fielded some calls when he first took the position and that

he eventually spent as much as 50 to 75 percent of his time answering calls.

Accordingly, Celsky's own work experience supports, rather than refutes, the

essential nature of taking phone calls.  See 29 C.F.R. § 1630.2(n)(3)(vii); see also

Conneen, 334 F.3d at 326.  And while it is true that the official job description uses

the qualifier "as necessary," it is quite clear that fielding phone calls is a critical

function of the Lead.  Specifically, the Lead acts as the final stop in calls escalating

through the Call Center system.  The only variable in this critical function is

frequency of calls referred to the Lead, which varies with call volume and the

complexity of individual calls.

We recognize that the essential function inquiry is often a jury question.  But

in this case, there are no factual issues to be resolved by the jury.  Celsky has not

proffered evidence that would create a genuine dispute as to whether taking phone

calls was an essential function of a Lead.  Thus, he cannot establish that he was a

"qualified individual" who could perform the essential functions of the Lead

position with or without reasonable accommodation.

**B.    Adverse Employment Action**

Celsky contends that he could have been reasonably accommodated by either

having all phone-call responsibilities reassigned or by being transferred to a

different position.  The ADA protects against discriminatory employment actions,

including failure to reasonably accommodate an individual's disability.  See 42

U.S.C. § 12112(b)(5)(A)-(B).  An employer's refusal to make reasonable

accommodations for an employee's disability or failure to engage in "reasonable

efforts to assist the employee and to communicate with the employee in good faith" both constitute adverse employment actions.  See Colwell v. Rite Aid Corp., 602 F.3d 495, 504 (3d Cir. 2010) (citation omitted).  Celsky invokes both failure-to-accommodate theories.

### 1.    *Accommodation Requests*

A reasonable accommodation may include, *inter alia*, "job restructuring, part-time or modified work schedules, [or] reassignment to a vacant position[.]"  42 U.S.C. § 12111(9)(B).  It is the plaintiff's burden to identify an accommodation, "the costs of which, facially, do not clearly exceed its benefits."  Skerski, 257 F.3d at 284 (citation omitted).  Whether a proposed accommodation is reasonable often presents a question of fact.  Turner, 440 F.3d at 414.  Nevertheless, when no jury could find a requested accommodation reasonable, summary judgment may be appropriate.  Cf. Buskirk, 307 F.3d at 170-71; Miller, 350 F. App'x at 729.

Celsky's claim regarding a "no-phone-call" accommodation cannot withstand Rule 56 scrutiny.  It is well settled that an employer is not required to "accommodate an employee by removing an essential function or restructuring a job so as to avoid it[.]"  Skerski, 257 F.3d at 285 n.4 (citing EEOC Interpretive Guidance, 29 C.F.R. pt. 1630, App. 1630.2(*o*)); see Donahue v. Consol. Rail Corp., 224 F.3d 226, 232 (3d Cir. 2000).  Accommodating Celsky's request would eviscerate the role of Customer Service Lead in the Call Center system.  Because taking calls is a critically important function of the Lead position, Celsky's request to remove phone work from his duties is *per se* unreasonable.  See Donahue, 224 F.3d at 232.

Celsky's request for transfer to another position within PHEAA that did not require phone use is a different matter.  It is undisputed that, in or around November 2017, Celsky requested to be transferred to "two part-time processing positions" so that he could maintain employment with PHEAA but avoid fielding phone calls.  (Doc. 17 ¶ 80; Doc. 20 ¶¶ 76, 80; Celsky Dep. 42:23-25).  According to Celsky, PHEAA summarily denied this request.  (Celsky Dep. 42:16-43:20).

PHEAA does not claim that Celsky would be unqualified for such a position or that transfer would be too burdensome.  Rather, PHEAA asserts that no such jobs were available.  In support of this contention, PHEAA cites paragraph 12 of the affidavit of Amber Rockwell, PHEAA's Senior Human Resources Analyst.  (See Doc. 17 ¶ 82 (citing Doc. 15-4 at 3-7, Rockwell Aff. ¶ 12)).  However, Rockwell's affidavit fails to mention anything about job openings at PHEAA during the specific time in question.  Celsky, on the other hand, has proffered competent evidence that such part-time positions were available when Celsky made his transfer request.  Specifically, Celsky establishes that PHEAA posted openings for a job called "PART TIME Records Clerk (3:30PM – 7:30PM)" in June 2017 with two vacancies, and then again from July to September 2017 with four vacancies.  (Doc. 20 ¶ 82; Doc. 20-2 at 7, 9).  Accordingly, there is a genuine dispute of material fact regarding whether Celsky's accommodation request—transfer to two part-time processing positions—was reasonable.

Moreover, Celsky argues that, even if no part-time processing positions were available when he made his request for accommodation, there were similar vacant full-time positions that PHEAA could have recommended as alternatives.  (See Doc.

20 ¶ 89(j), (k), (m)-(r)).  PHEAA, "in the face of a request for accommodation,"
cannot simply "sit back passively, offer nothing, and then, in post-termination
litigation, try to knock down every specific accommodation" sought as
unreasonable.  Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 315 (3d Cir. 1999).
Such conduct would run afoul of the interactive process.  Id. at 315-16; see *infra*
Section III(B)(2).  Consequently, even if two part-time processing positions were not
available when Celsky made his request, that fact alone would not defeat Celsky's
failure-to-accommodate claim.  PHEAA's response to Celsky's transfer request
would still be relevant to determining whether PHEAA acted in good faith in the
interactive process.  See Taylor, 184 F.3d at 315-16.

## 2. *Good-Faith Participation in the Interactive Process*

Celsky claims that PHEAA violated the ADA by failing to participate in good
faith in the "interactive process."  The interactive process describes the flexible,
informal communication between an employer and employee concerning an
employee's disability, the limitations resulting from that disability, and "potential
reasonable accommodations that could overcome those limitations."  29 C.F.R.
§ 1630.2(*o*)(3); see Taylor, 184 F.3d at 311.  A plaintiff pursuing an ADA failure-to-
accommodate claim under a theory of lack of good-faith participation in the
interactive process must demonstrate four elements: (1) the employer knew about
the plaintiff's disability; (2) the plaintiff requested an accommodation for his
disability; (3) the employer failed to make a good-faith effort to assist the plaintiff in
seeking an accommodation; and (4) the plaintiff "could have been reasonably
accommodated but for the employer's lack of good faith."  Colwell, 602 F.3d at 504

(citation omitted).  In the instant case, the only undisputed element is the first—

PHEAA was aware of Celsky's disability.  As set forth below, there are factual

disputes permeating all of the other elements of Celsky's claim.

Both employer and employee have a duty to act in good faith and to attempt

to identify an appropriate reasonable accommodation, which could include

"*reassignment to a vacant position.*"  42 U.S.C. § 12111(9)(B) (emphasis added);

Colwell, 602 F.3d at 507; Mengine v. Runyon, 114 F.3d 415, 420 (3d Cir. 1997).  Our

court of appeals has held that employers can demonstrate "good faith" by taking

such steps as "meet[ing] with the employee who requests an accommodation,

request[ing] information about the condition and what limitations the employee

has, ask[ing] the employee what he or she specifically wants, show[ing] some signs

of having considered [the] employee's request, and offer[ing] to discuss available

alternatives when the request is too burdensome."  Taylor, 184 F.3d at 317.

Celsky asserts that PHEAA acted in bad faith by failing to offer him other

open positions within the agency.  Celsky points to several vacant positions—

including Records Clerk, Records Associate 1, and Commercial Adjustment

Processing Clerk—for which he was purportedly qualified.  (See Doc. 20 ¶ 89 &

citations).  He alleges that PHEAA's conduct fell short because PHEAA merely

directed him to the Pathways intranet site and "never suggested any vacant,

existing positions at PHEAA . . . for potential reassignment."  (Id. ¶ 88).

PHEAA denies any bad faith on its part.  It rejoins that it held multiple

meetings with Celsky to discuss possible accommodations, asked him for other

proposed reasonable accommodations when it declined his "no-phone-call" request,

offered to modify his break schedule and to temporarily remove escalated calls from his duties, and directed him to Pathways to find vacant positions for possible transfer.  (See Doc. 15-4 at 78-79 (reviewing steps taken by PHEAA in interactive process); Doc. 17 ¶¶ 80-84).

Although an employer may exhibit bad faith by failing to participate at all in identifying potential transfer positions, see Mengine, 114 F.3d at 420, Celsky's claim is more nuanced: he claims that PHEAA fell short in its reasonable accommodation obligations by failing to take the affirmative step of offering specific reassignment alternatives.  Whether PHEAA's failure to make Celsky a specific job reassignment offer constitutes a failure to accommodate cannot be determined on the present record because the parties disagree on what transpired when Celsky raised the issue of reassignment.

PHEAA apparently sought input from Celsky regarding possible reassignments and suggested that Celsky utilize Pathways, which contained a comprehensive list of open positions within the agency.  Yet, PHEAA's response— which is not well developed in the Rule 56 record—to Celsky's specific request for two part-time processing positions raises a number of factual issues regarding the interactive process: (1) Who first raised the possibility of reassignment and when did that occur?  (2) What was the response to the request for reassignment and when did that occur?  (3) Were there vacant positions at the time of the parties' initial discussions about reassignment and how long did the positions stay open? (4) Did PHEAA offer any assistance to Celsky other than a referral to the Pathways portal?  (5) Did Celsky enter the Pathways portal after prompting to determine

specific job opportunities and attempt to apply for any positions?  (6) Are there clearly established policies when seeking reassignment through the Pathways portal, such as filling out an application?  (7) Did PHEAA make any affirmative representations to Celsky about reassignment to a new position such as a promise to transfer subject to completion of the application process or a review of qualification? (8) In general, what were the parties' expectations with respect to Celsky's use of the Pathways portal to identify potential employment alternatives? These questions and more abound relevant to whether each party participated in good faith during the interactive process.

The court concludes that there are genuine factual disputes about both parties' conduct during the interactive process, specifically on the issue of transfer to a new position.  When there is a genuine dispute about good faith, "summary judgment will typically be precluded."  Taylor, 184 F.3d at 318 (citation omitted). Such is the case with Celsky's failure-to-accommodate claim.

IV.    **Conclusion**

We will grant in part and deny in part PHEAA's motion for summary

judgment.  We will grant PHEAA's Rule 56 motion to the extent that we find that

taking phone calls is an "essential function" of the Lead position.  We will deny

PHEAA's motion in all other respects.  An appropriate order shall issue.


/S/ CHRISTOPHER C. CONNER
Christopher C. Conner
United States District Judge
Middle District of Pennsylvania

Dated:     September 10, 2020